IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:18-CR-37-FL-1

UNITED STATES OF AMERICA

v.

ORDER

CHARLES ANTHONY WALKER, JR.,

Defendant.

This matter comes before the court to address Defendant's motions to vacate Special Administrative Measures ("SAMs") [DE-129] and rescind a protective order [DE-136]. An evidentiary hearing for both motions was held on June 18, 2019. [DE-141, -146]. The Government then submitted a Notice of Defendant's Violation of Restrictions, [DE-153], and a second evidentiary hearing was held on August 19, 2019 to address the Notice, [DE-190]. For the reasons stated below, Defendant's motion to vacate SAMs is denied, and his motion to amend a protective order is allowed.

## I. PROCEDURAL BACKGROUND

On November 19, 2018, the Government filed a criminal complaint charging Defendant and four co-defendants with Hobbs Act robbery of a jewelry store and aiding and abetting in violation of 18 U.S.C. §§ 1951, 2. [DE-1]. On December 4, 2018, a Grand Jury sitting in the Eastern District of North Carolina returned an indictment charging Defendant with four counts: (1) conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951; (2) Hobbs Act robbery of the Kay Jewelers in Elizabeth City, North Carolina and aiding and abetting in violation of 18 U.S.C. §§ 1951, 2; (3) use of firearms in furtherance of a crime of violence and aiding and abetting in violation of 18 U.S.C. §§ 924(c), 2; and (4) Hobbs Act robbery of the Kay Jewelers in

Garner, North Carolina and aiding and abetting in violation of 18 U.S.C. §§ 1951, 2. Indictment [DE-14]. The Government moved that Defendant be detained pending his trial, and on December 18, 2018, Defendant executed a written waiver of his detention hearing. [DE-74]. Based upon Defendant's waiver, the court found by clear and convincing evidence that no condition or combination of conditions would reasonably assure Defendant's appearance as required and the safety of any other person and the community pending Defendant's trial. *Id.* Defendant was therefore detained pending trial. *Id.*

On March 18, 2019, Defendant filed a pro se motion to remove unlawful mail, phone, and visit restrictions placed upon him while detained. [DE-102]. The court ordered defense counsel to clarify the purpose and intent of the motion. On May 14, 2019, defense counsel filed a motion to vacate the SAMs imposed on Defendant. [DE-129]. The court entered a protective order on May 21, 2019, [DE-132], and on June 12, 2019, defense counsel filed a motion to rescind the protective order, [DE-136]. The Government responded to the motion to vacate the SAMs and the motion to rescind the protective order. [DE-134, -139]. Because of the significant factual overlap allegedly necessitating the SAMs and the protective order, the undersigned held an evidentiary hearing regarding both motions on June 18, 2019. [DE-141, -146]. On July 11, 2019, the Government submitted a Notice of Defendant's Violation of Restrictions alleging that Defendant continued to use the telephone while incarcerated. [DE-153]. Defendant submitted a pro se response to the Notice in which he admitted to using the phone and to passing messages through other inmates. [DE-167] at 3. The undersigned held a second evidentiary hearing on August 19, 2019 to address the allegations contained in the Government's Notice. [DE-191]. Following the second hearing, the court requested supplemental briefing from the parties touching upon the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78 (1987). *Id.* Both parties submitted

2

supplemental briefing. [DE-192, -193].

## II. STATEMENT OF THE FACTS

At the first evidentiary hearing, the Government offered the testimony of FBI Special Agent Daniel Robertson. Hr'g Tr. [DE-146] at 4:12. Special Agent Robertson investigated an armed robbery that occurred in July 2018 in Elizabeth City, North Carolina, and he investigated another armed robbery that occurred in October 2018 in Garner, North Carolina. *Id.* at 5:7–10. Special Agent Robertson noticed similarities between the two robberies, and after some investigation, he concluded that Defendant was involved in both. *Id.* at 5:22–6:3.

Defendant was arrested in November 2018, and on December 18, 2018, following his waiver of a detention hearing, he was ordered to be detained pending trial. [DE-74]. Presently, Defendant is detained in pre-trial custody at the Wake County Jail in Raleigh, North Carolina. [DE-167].

In mid-December 2018, Special Agent Robertson was approached by Leza Driscoll, defense counsel for Christopher Brown, one of Defendant's co-defendants. Hr'g Tr. [DE-146] at 6:24–7:3. Ms. Driscoll told Special Agent Robertson that Defendant had spoken with Mr. Brown about harming a potential witness in the case. *Id.* at 11:8–12. Special Agent Robertson interviewed Mr. Brown. *Id.* at 7:16. Mr. Brown reported that Defendant thought some of the information that led to their arrest came from a woman named Jasmine Partridge who lived in Carrboro, North Carolina. *Id.* at 11:17–21. Mr. Brown stated that Defendant told him that he had "the hitters sent to the house," which Mr. Brown understood to be a threat to Ms. Partridge because Defendant believed she was cooperating with authorities. *Id.* at 11:22–12:1. Law enforcement officers became concerned because the threat had a level of specificity, so an Orange County Sheriff's deputy spoke with Ms. Partridge and explained the threat to her. *Id.* at 13:4–9. When asked if

3

there was any evidence that "the hitters" were actually sent to Ms. Partridge's house, Special Agent Robertson replied, "not that I can recall." *Id.* at 14:7.

Special Agent Robertson was also concerned about a Facebook post written by Tamika Rene Kelly Lloyd, a friend of Defendant's. *Id.* at 13:10–19. In her post, Ms. Lloyd referred to Mr. Brown and Ms. Partridge as "rats," which Special Agent Robertson understood to be an assertion that Mr. Brown and Ms. Partridge were cooperating with law enforcement. *Id.* at 13:13.

Special Agent Robertson then began investigating Ms. Lloyd. *Id.* at 14:13. He listened to numerous recorded jail phone conversations between Ms. Lloyd and Defendant during which they appeared to speak in code. *Id.* at 15:8–10. In particular, in December 2018, Ms. Lloyd asked Defendant if he wanted her to "do a Peter Roll" in the context of speaking about Ms. Partridge. *Id.* at 16:16–21. Special Agent Robertson learned that "Peter Roll" is a slang term for murder. *Id.* at 16:24–25. Defendant responded, "no, I'm watching my diet in here." *Id.* at 12–16. In another phone conversation shortly after Defendant's arrest, Defendant and Ms. Lloyd discussed "shoelaces." *Id.* at 18:11–15. Special Agent Robertson learned that "shoelaces" is a slang term for guns. *Id.* at 18:16–20. Later, in 2019, Defendant and Ms. Lloyd again discussed "shoelaces," and Ms. Lloyd was trying to find out who might have "shoelaces." *Id.* at 18:21–25.

On December 13, 2018, the Government submitted an Inmate Action Request ("IAR") form. [DE-134-3]. The form requested that the Nash County jail, where Defendant was being housed at the time, "restrict phone/visiting to attorney only and placed [sic] in restrictive housing." *Id.* The justification for the request was:

> WALKER was the leader of these defendants in at least 2 armed robberies; WALKER has threatened his co-defendants and their families' lives; there is also credible information that he has placed hits on potential witnesses and law enforcement. WALKER must be placed in restricted housing where his communication can be restricted, monitored, and recorded.

4

*Id.* At some point, those restrictions were lifted, and Defendant had no restrictions on his communications. Hr'g Tr. [DE-146] at 19:5–9.

At the end of February 2019, Special Agent Robertson was contacted by Elisa Salmon, defense counsel for another co-defendant, Joey Wayne Chambers. *Id.* at 19:18–24. Ms. Salmon informed law enforcement that Angela McAdoo, her client's mother, told her that Defendant and others, possibly including Ms. Lloyd, wanted to contact Ms. McAdoo regarding information that would exonerate Mr. Chambers. *Id.* at 20:1–5. Ms. McAdoo knew Defendant, and she told Special Agent Robertson, "I don't know who they're trying to kill, but I want nothing to do with it." *Id.* at 20:8–9. Ms. McAdoo was concerned that Defendant and Ms. Lloyd were trying to contact her. *Id.* at 20:10–13.

On February 28, 2019, a second Inmate Action Request was submitted regarding Defendant. [DE-134-4]. The form requested the Wake County jail, where Defendant had been transferred since the first IAR, to "restrict phone, visitation, and mail to attorney only and placed [sic] in restrictive housing." *Id.* The restriction prevented Defendant from communicating with anyone other than his attorney. *Id.* The justification for the request was, again:

> WALKER was the leader of these defendants in at least 2 armed robberies; WALKER has threatened his co-defendants and their families' lives; there is also credible information that he has placed hits on potential witnesses and law enforcement. WALKER must be placed in restricted housing where his communication can be restricted, monitored, and recorded.

*Id.*

After restrictions were again placed on Defendant's communications, Special Agent Robertson believed Defendant used a third-party inmate to communicate with others, including Ms. Lloyd. *Id.* at 21:16–21. The inmate would call Ms. Lloyd and pass messages between her

5

and Defendant. *Id.* at 21:22–24. In one such recorded conversation, Defendant inquired whether Ms. Lloyd had spoken with someone, and Ms. Lloyd had not, so Defendant was frustrated. *Id.* at 22:4–7. Defendant said, "go in the kitchen on her, don't get in trouble, and when you see her, blow her out the frame." *Id.* at 22:8–10.

Additionally, Special Agent Robertson learned that Mr. Brown reported that Defendant was concerned because another co-defendant, Maleek Shawn Maynard, had been arrested subsequently to the other co-defendants. *Id.* at 23:1–5. Mr. Brown believed Defendant thought that Mr. Maynard was cooperating with authorities. *Id.* at 23:6–8. Mr. Brown said it was a race between the authorities to arrest Mr. Maynard and "Mr. Walker's people to get to Mr. Maynard." *Id.* at 23:9–13.

Special Agent Robertson testified that Defendant had a history of interfering with victims and witnesses. Special Agent Robertson testified further that in 2010, Defendant had been arrested for shooting at a woman named Pamela Haizlip and that Defendant sent a letter to someone outside the jail with instructions to get Ms. Haizlip's phone and send exculpatory information to make it appear as if Defendant were set up. *Id.* at 24:8–25:3. According to Special Agent Robertson, while Defendant was incarcerated at the Guilford County Jail in 2010, he had an in-person visit, and he and his visitor mouthed words or used hand signals so that their conversation was not recorded. *Id.* at 25:6–13.

Special Agent Robertson also testified that during his current period of detention Defendant may have used a different inmate's name to either send or receive mail during his present incarceration. *Id.* at 26:1–6. Additionally, in another phone call in 2019, Defendant said, "there are too many red flags there. We're going to rock them to sleep." *Id.* at 37:15–17. Special Agent Robertson testified that he has not heard Defendant make an explicit threat, and he does not know

6

what Defendant's intentions are behind some of his statements; Special Agent Robertson used the context and background of the conversations to try to decipher Defendant's code. *Id.* at 42:21–43:1.

At the second evidentiary hearing, Special Agent Robertson testified that between March and June 2019, Defendant made more than one hundred phone calls despite having been prohibited from using the jail telephone. Defendant sometimes used his own phone PIN, and other times, other inmates called on his behalf. The conversations were mostly about Defendant's case, his family, and his son. The phone calls were made to Ms. Lloyd and Lavina Suarez, the mother of Defendant's son. The word "shoelace" was used, and in one conversation, Ms. Lloyd said, "that's what the green light is, right there." The calls also indicate that Defendant believed Ladamingo Baldwin betrayed him. However, Special Agent Robertson testified that in the majority of the calls, Defendant was asserting his innocence and asking about his family, and he made no explicit threats.

Special Agent Robertson also testified at the second hearing that Defendant sent mail using another inmate's return address. Defendant mailed out his discovery and FBI reports. He called Ms. Baldwin a "snake" in the letters, and there was one letter that did not mention Ms. Baldwin's name but contained artwork relating to snakes and discussed potential violence against snakes. Defendant also referred to Ms. Baldwin as a "fallen star."

### III. DISCUSSION

Six issues were presented in Defendant's motions and at the evidentiary hearings: (1) whether the Federal Rules of Evidence apply to the hearings, and, if so, whether hearsay testimony offered by the Government's witness should be stricken; (2) whether the restrictions placed on Defendant's communications are equivalent to the SAMs described in 28 C.F.R. § 501.3; (3)

7

whether the restrictions violate Defendant's Sixth Amendment right to effective assistance of counsel; (4) what legal standard governs Defendant's First Amendment claim, if the restrictions are not SAMs; (5) whether the restrictions violate Defendant's First Amendment right to freedom of speech; and (6) whether the protective order should be rescinded.

## A. The Federal Rules of Evidence do not apply to the evidentiary hearing.

Federal Rule of Evidence 1101 provides that the Rules of Evidence apply in criminal cases and proceedings with three exceptions:

(1) the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility;

(2) grand-jury proceedings; and

(3) miscellaneous proceedings such as: extradition or rendition; issuing an arrest warrant, criminal summons, or search warrant; a preliminary examination in a criminal case; sentencing; granting or revoking probation or supervised release; and considering whether to release on bail or otherwise.

Fed. R. Evid. 1101(d). The Government contends that the evidentiary hearing on Defendant's motions was a "miscellaneous proceeding" akin to one "considering whether to release on bail or otherwise," and therefore the Rules of Evidence do not apply. Hr'g Tr. [DE-146] at 7:12–21; *see* 18 U.S.C. § 3142(f)(2)(B). Defendant contends that the Rules apply because the evidentiary hearing was a criminal proceeding and no exception was applicable. *Id.* at 7:8.

A hearing on a motion to vacate Defendant's SAMs and rescind a protective order is not listed in Rule 1101(d)(3) as a miscellaneous proceeding in which the Rules of Evidence do not apply. However, the enumerated proceedings in Rule 1101(d)(3) are not an exhaustive list. *See* Fed. R. Evid. 1101(d)(3) ("miscellaneous proceedings *such as* . . ." (emphasis added)); *Hollis v. Lynch*, 827 F.3d 436, 443 (5th Cir. 2016) ("The statutory use of a non-exhaustive list of illustrative examples does not exclude items not expressly specified."); *United States v. Hawley*, 919 F.3d 252,

8

257 (4th Cir. 2019). To determine whether Rule 1101(d) encompasses a non-enumerated miscellaneous proceeding, other courts have analogized the non-enumerated miscellaneous proceeding to an enumerated one. *See United States v. Hernandez*, 906 F.3d 1367, 1370 (11th Cir. 2018) (holding that the Rules of Evidence do not apply to proceedings to establish prior convictions "because they are miscellaneous proceedings akin to sentencing hearings"); *United States v. SLW*, 406 F.3d 991, 995 (8th Cir. 2005) (holding that the Rules of Evidence do not apply to hearings on motions to transfer juveniles for criminal prosecution as adults because those proceedings "are analogous to preliminary examinations in criminal cases").

Likewise, here, the Government contends that the hearing on Defendant's motions is analogous to a detention hearing, which is an enumerated "miscellaneous proceeding" in Rule 1101(d)(3). The court agrees. Defendant's motions address the conditions of his pretrial confinement just as a detention hearing would address the conditions of pretrial release. Accordingly, because the evidentiary hearing on defendant's motions is analogous to a detention hearing, it is a "miscellaneous proceeding" to which the Rules of Evidence do not apply. Defendant's objection to hearsay is overruled.

## B. The restrictions placed on Defendant are not SAMs within the meaning of 28 C.F.R. § 501.3.

Title 28 C.F.R. § 501.3(a) provides that "upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." The SAMs may include but are not limited to restrictions on activities such as correspondence, visiting, and use of a telephone. *Id.* These restrictions must be "reasonably necessary to protect persons against the risk of acts of violence of terrorism." *Id.*; *see also United*

*States v. Felipe*, 148 F.3d 101, 110–11 (2d Cir. 1998) (holding that the "very purpose of SAMs is to prevent Defendant from soliciting violence while incarcerated.").

Defendant first argued that the restrictions placed upon him should be analyzed as SAMs pursuant to 28 C.F.R. § 501.3. Def.'s Mot. [DE-129] at 1–8. However, Defendant later conceded that the IARs are not SAMs. [DE-193] at 3. The Government also contended that the IARs are not SAMs. Gov't's Resp. [DE-134] at 5. The court agrees that 28 C.F.R. § 501.3 is inapplicable in this case, and neither party disputes this finding.

The restrictions at issue in the present case are distinguishable from SAMs because here, Defendant was in pre-trial detention at a county jail, and he was not within the custody of the Bureau of Prisons. Because the regulations apply to the Bureau of Prisons and Defendant is housed in pre-trial detention at a county jail, the regulation is inapplicable. *See United States v. Mohamed*, 103 F. Supp. 3d 281, 284 (E.D.N.Y. 2015) (noting that SAMs are placed upon a defendant when the United States Attorney General requests them from the Director of the Federal Bureau of Prisons); *United States v. Savage*, No. 07-550-03, 2012 WL 5866059, at *2 (E.D. Pa. Nov. 16, 2012) ("Federal regulations provide that the BOP may implement SAMs upon the direction of the Attorney General"). The IAR is therefore not to be analyzed under the standard set forth in 28 C.F.R. § 501.3; instead, it will be analyzed as any other First Amendment challenge to a restriction of a detainee's right to freedom of speech.

## C. The Sixth Amendment issue appears to have been resolved.

Defendant contended that the restrictions violate his Sixth Amendment right to assistance of counsel because they limited his communications to only his attorney and they prevented agents of his attorney, such as paralegals, investigators, or expert witnesses, from interacting with him. Def.'s Mot. [DE-129] at 6–7. The Government responded that it did not intend to restrict

10

Defendant's communications with agents and staff of his attorney's law firm, and it offered to modify the IAR to specify that agents of Defendant's counsel are permitted to communicate with Defendant. Gov't's Resp. [DE-134] at 6.

In accordance with the Government's proposal, the court ordered the Government to submit a new IAR allowing Defendant to communicate with all staff and agents of his attorney's firm. [DE-135]. Defendant did not raise the Sixth Amendment argument at the hearing, and the court therefore assumes that it was resolved with the amended IAR.

## D. The framework for First Amendment challenges brought by pretrial detainees is found in *Turner v. Safley*, 482 U.S. 78 (1987).

Much confusion has been expressed in this case as to the proper standard for evaluating First Amendment challenges brought by a pretrial detainee. *See* Hr'g Tr. [DE-146] at 58:2–4. Defendant's first filing in this matter referenced a federal regulation, 28 C.F.R. § 501.3, and referred to the IAR as a SAM. [DE-129]. However, all parties now concede that the IAR is not a SAM because Defendant is not housed in federal custody, and the regulation does not apply. [DE-192, -193].

At the second evidentiary hearing, the parties were unable to offer the court an alternative framework for analyzing whether the IAR violates Defendant's First Amendment rights. Accordingly, the Court asked the parties to submit supplemental briefing on the standard articulated in *Turner*. Defendant's supplemental brief distinguishes *Turner* and discusses whether the IAR amounts to punishment in the constitutional sense, citing *Bell v. Wolfish*, 441 U.S. 520 (1979). For the reasons discussed below, the court finds that the appropriate standard for evaluating First Amendment challenges brought by pretrial detainees is found in *Turner*, and the punishment analysis found in *Bell* applies to Fifth Amendment due process claims, not First

11

Amendment claims.

### 1. The *Bell* Standard

In *Bell*, pretrial detainees at the Metropolitan Correctional Center, a federally operated custodial facility, raised several claims. 441 U.S. at 531. First, they argued that "double-bunking" deprived them of liberty without due process of law in violation of the Fifth Amendment. *Id.* The Supreme Court held, "In evaluating the constitutionality of conditions or restrictions of pretrial detention *that implicate only the protection against deprivation of liberty without due process of law*, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."[1] *Id.* at 535 (emphasis added). The Supreme Court ultimately held that double-bunking did not constitute punishment and therefore did not violate the detainees' Fifth Amendment right to due process of law.

Next, the detainees in *Bell* challenged several security measures on the grounds that they violated the Fifth, First, and Fourth Amendments. *Id.* at 544. One of those security measures was a "publisher-only" rule under which detainees could only receive books or magazines if they were mailed directly from the publisher or a book club. *Id.* at 549. In discussing the First Amendment challenge to the publisher-only rule, the Supreme Court held that the restriction did not violate the First Amendment because it was "a rational response by prison officials to an obvious security problem." *Id.* at 550. The Supreme Court considered whether "the rule operates in a neutral fashion, without regard to the content of the expression" and whether there were alternative means of communication available. *Id.* at 551–52. It concluded that the rule was a "reasonable 'time, place and manner' regulation that is necessary to further significant governmental interests." *Id.*

---

[1] To determine whether restrictions amount to punishment, the Supreme Court considered "whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Bell*, 441 U.S. at 561.

at 552 (citations omitted).

The Supreme Court did not discuss punishment in addressing the First Amendment claim. Later in the *Bell* opinion, the Supreme Court held that the various security measures at issue, including the publisher-only rule, did not violate the Fifth Amendment. *Id.* at 561. The Court held: "Nor do we think that the four MCC security restrictions and practices described in Part III, supra, constitute 'punishment' in violation of the rights of pretrial detainees *under the Due Process Clause of the Fifth Amendment*." *Id.* (emphasis added).

In summary, the Supreme Court discussed punishment only in the context of the detainees' Fifth Amendment challenges in *Bell*. It did not discuss punishment when analyzing the First Amendment claim, but instead questioned whether the restriction was content neutral and whether there were alternative means of communication available, in line with the general framework for analyzing any time, place, or manner restriction of speech. *Id.* at 552.

## 2. The Turner Standard

*Turner* postdates *Bell*, and it involved prisoners' First Amendment challenge to a restriction on inmate-to-inmate correspondence. 482 U.S. at 81. In *Turner*, the Supreme Court discussed *Bell* and several other cases addressing the First Amendment rights of inmates, including *Pell v. Procunier,* 417 U.S. 817 (1974), *Jones v. N.C. Prisoners' Union*, 433 U.S. 119 (1977), and *Block v. Rutherford*, 468 U.S. 576 (1984) (another case involving a pretrial detainee). 482 U.S. at 89. The Court relied on those prior cases in formulating the four factors it set forth in *Turner*. *Id.* ("As our opinions in *Pell*, *Bell*, and *Jones* show, several factors are relevant in determining the reasonableness of the regulation at issue."). Because *Turner* postdates *Bell*, discusses it, and sets forth a new framework, the court here will apply the *Turner* factors unless the present case can be distinguished from *Turner* and analogized to *Bell*.

13

Defendant argues that his status as a pretrial detainee distinguishes his case from *Turner*. [DE-193] at 2–3. However, the Fourth Circuit rejected that distinction in *Hause v. Vaught*, 993 F.2d 1079, 1082 (4th Cir. 1993). In *Hause*, a pretrial detainee raised a First Amendment challenge to a jail's restrictions on the receipt of publications. *Id.* at 1081. The Fourth Circuit held:

> the concern for security is the same for pretrial detainees as for convicted inmates. We therefore apply the same legal standard for detainees as for convicted inmates with due regard for the particular circumstances of pretrial detainment. Accordingly, we shall apply the *Turner* standard to determine the constitutionality of the Detention Center's restrictions on receipt of publications.

*Id.* at 1082. This court has likewise applied the *Turner* standard to First Amendment challenges brought by pretrial detainees. *Weeks v. Elks*, No. 5:13-CT-3149-FL, 2014 WL 5810317, at *2 (E.D.N.C. Nov. 7, 2014) (asking whether a restriction on pretrial detainees' mail was "reasonably related to legitimate penological interests," citing *Tuner*, and not discussing the *Bell* standard); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 213 (4th Cir. 2017) (applying the *Turner* factors to a First Amendment challenge brought by a civil detainee); *United States v. Mohamed*, 103 F. Supp. 3d 281, 287 (E.D.N.Y. 2015) ("while the government may have different interests with respect to a pre-trial detainee than with respect to a convicted prisoner, the steps of a *Turner* review of a pretrial detainee's challenges remain the same.").

The court will apply the *Turner* factors because the present case involves a First Amendment challenge to a restriction of an inmate's freedom of speech. Defendant's discussion of punishment would only be relevant to a Fifth Amendment challenge, which Defendant has not raised. Additionally, Defendant's argument that *Turner* should not apply here because he is a pretrial detainee is not persuasive because the Fourth Circuit and this court have applied *Turner* to pretrial detainees' First Amendment claims. Accordingly, the court will analyze the IAR using the four factors established in *Turner.*

**E. The restrictions do not violate Defendant's First Amendment right to freedom of speech.**

Defendant contends that the restrictions violate his First Amendment right to freedom of speech because they prohibit him from communicating with his family. Def.'s Mot. [DE-129] at 7–8. The First Amendment protects the right of inmates "to communicate with others beyond the prison walls." *Heyer*, 849 F.3d at 213 (collecting cases). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822. The "legitimate policies and goals of the corrections system" are important considerations in analyzing a First Amendment challenge in the prison context. *Id.*

In *Turner*, the Supreme Court established that a restriction of an inmate's freedom of speech "is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The reasonableness of the regulation is determined by weighing four factors. *Id.* First, "[t]here must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block*, 468 U.S. at 586). Within this first factor are two considerations: the regulation "cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," and "the governmental objective must be a legitimate and neutral one." *Turner*, 482 U.S. at 89–90.

The second factor "is whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. If there are other avenues for communication, then the court should give deference to the correctional officials who established the regulation. *Id.* However,

in a case preceding *Turner*, the Fourth Circuit held that if the regulation "constitutes a total denial of an inmate's right to free speech, including any possible alternative means of exercising that right," then it is subject to strict scrutiny, and the proponent of the regulation must show a "substantial state interest and the absence of a less restrictive alternative." *Vester v. Rogers*, 795 F.2d 1179, 1182 (4th Cir. 1986) (holding that because the regulation did not "operate as an absolute denial of free speech" or "affect the rights of nonprisoners," it was properly analyzed as a time, place, or manner restriction of speech).

The third *Turner* factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. The fourth factor is "the absence of ready alternatives"; if no alternative means to satisfy the government interest exist, then the regulation is likely reasonable. *Id.*

Additionally, the Government conceded at the first hearing that it bears the burden of showing that the restrictions on Defendant's speech are valid. Hr'g Tr. [DE-146] at 57:11–12. However, the Supreme Court has held that the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (applying the *Turner* factors to restrictions on prison visitation). Accordingly, it is Defendant's burden to show that the restrictions violate his First Amendment rights. Upon balancing the four *Turner* factors, it is clear that Defendant has not met his burden.

### 1. The connection between the restrictions and the government interest

The first *Turner* factor is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89 (quoting *Block*, 468 U.S. at 586). The government interest "must be a legitimate and neutral one," and the connection between the regulation and the interest cannot be "so remote as to render the policy arbitrary or

irrational." *Turner*, 482 U.S. at 89–90.

Here, the government interest at stake is the protection of the public. Special Agent Robertson testified that he was concerned for the safety of Jasmine Partridge, Angela McAdoo, and Maleek Maynard. The protection of the public is a legitimate and neutral government interest. *See Heyer*, 849 F.3d at 215 ("There is no doubt that BOP has a legitimate interest in maintaining the security of its facilities and in protecting the public from further criminal acts by inmates and detainees."); *Matherly*, 859 F.3d at 283 (holding that "the BOP can, consistent with the First Amendment, censor outgoing non-legal mail for material that [] threatens the public"). Additionally, the government interest in protecting the public exists even before an actual, specific threat materializes. *United States v. Stotts*, 925 F.2d 83, 87 (4th Cir. 1991) ("The BOP can and should act in anticipation of prospective security concerns. We will not require that an actual breach of security occur before upholding regulations designed to prevent it." (citations omitted)).

The connection between the government interest at stake and the restrictions on Defendant's communications is not arbitrary or irrational. At the first evidentiary hearing, the government offered the following evidence in support of its argument that the restrictions were needed to protect the public: (1) Christopher Brown, a co-defendant, said that Defendant suspected Jasmine Partridge of cooperating with police, and he had "the hitters sent to the house"; (2) Tamika Lloyd wrote a Facebook post in which she called Mr. Brown and Ms. Partridge rats; (3) Defendant used coded language in his recorded jail phone calls with Ms. Lloyd, and in those calls, Ms. Lloyd asked him if he wanted her to do a Peter Roll (which likely means murder), and Defendant responded, "no, I'm watching my diet"; they discussed shoelaces (which likely means guns); and Defendant said, "there are too many red flags there; we're going to rock them to sleep"; (4) Angela McAdoo, the mother of one of the co-defendants, said that Defendant and others wanted to contact

17

her regarding exonerating evidence, but she was afraid to speak with Defendant; (5) Defendant used another inmate to pass messages to Ms. Lloyd, and he said, "go in the kitchen on her" and "blow her out the frame"; (6) Mr. Brown said Defendant was concerned that Maleek Maynard, another co-defendant, had cooperated with police, and it was a race between police and Defendant's people to get to Mr. Maynard; (7) in 2010, Defendant sent a letter from jail instructing someone to steal his alleged victim's phone, and he used hand signals during a visitation; and (8) Defendant may have used another inmate's name to send or receive mail. At the second hearing, the Government offered evidence that Defendant continued to use the phone and send mail despite knowing that he was prohibited from doing so, he mailed out his discovery material, Defendant and Ms. Lloyd continued to use coded language, Defendant called Ms. Baldwin a snake, and Defendant sent a letter stating that snakes meet a violent demise.

The evidence shows that there is more than an arbitrary or irrational connection between the restrictions on Defendant's speech and the government interest in protecting the public. Defendant used coded language with Ms. Lloyd, and they discussed a Peter Roll, which is likely code for murder, and shoelaces, which is likely code for guns; Defendant said, "we're going to rock them to sleep"; and he said, "go in the kitchen on her" and "blow her out the frame." Additionally, Defendant called Ms. Baldwin a snake and wrote about violence towards snakes. It is not arbitrary or irrational to conclude that Defendant discussed harming people. Accordingly, in order to protect the public, it was not arbitrary or irrational to restrict Defendant's communications.

Additionally, the connection between the restrictions and the protection of the public is particularly strong. Defendant used coded language to discuss murder and guns with Ms. Lloyd, and he wrote about violence towards snakes. The Government has identified Ms. Partridge, Mr.

18

Brown, Mr. Maynard, Ms. McAdoo, and Ms. Baldwin as potential targets of the violence discussed by Defendant. The restrictions strongly advance the Government's interest in protecting those individuals.

In summary, the Government presented sufficient evidence to show that the connection between the restrictions on Defendant's speech and the legitimate government interest in protecting the public is strong. Accordingly, the first *Turner* factor weighs in favor of the restrictions.

### 2. Alternative means of communication

The second *Turner* factor "is whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. If there are other avenues for communication, then the court should give deference to the correctional officials who established the regulation. *Id.*

Here, there are no other avenues for communication available to Defendant. The IAR completely restricts his ability to use the phone, send or receive mail, or receive visitors, with the exception of his attorney. Defendant is entirely unable to communicate with his family.

In *Vester*, the Fourth Circuit held that if a restriction "constitutes a total denial of an inmate's right to free speech, including any possible alternative means of exercising that right," then it is subject to strict scrutiny. 795 F.2d at 1182. *Vester* predates *Turner* by one year, and *Turner*'s factor-balancing approach likely replaces *Vester*'s dichotomy between total restrictions of speech and time, place, or manner restrictions. Nonetheless, *Vester* demonstrates the Fourth Circuit's heightened concern for total denials of freedom of speech as opposed to time, place, or manner restrictions. The IAR at issue here is a total restriction on Defendant's ability to communicate with anyone other than his attorney. Accordingly, the second *Turner* factor weighs

19

in Defendant's favor.

### 3. The burden on guards and other inmates and the allocation of prison resources

The third *Turner* factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. If the restrictions are lifted, the Government would likely continue to monitor Defendant's communications, as it has been, and there would be some burden and effect on the allocation of prison resources. *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1049 (9th Cir. 2002) ("allowing Valdez telephone access would have required the defendants to allocate additional resources to monitor his telephone conversations to ensure that he did not try to tip off his cohorts"). Accordingly, the third factor weighs in the Government's favor.

### 4. Ready alternatives

The fourth *Turner* factor is "the absence of ready alternatives." 482 U.S. at 90. Here, the alternative way to protect the public is for law enforcement to monitor Defendant's communications and act if they detect a threat. As noted above, monitoring Defendant's communications would increase the burden on prison resources. Accordingly, as much as this fourth factor weighs in Defendant's favor, the third factor weighs equally in the Government's favor.

In summary, two of the four *Turner* factors weigh in favor of lifting the restrictions: Defendant has no alternative means of communication, and there is an alternative way to protect the public. Two of the factors also weigh in favor of the Government: there is a strong connection between the restrictions and the government interest at stake, and lifting the restrictions would place a burden on guards and resources. The third and fourth *Turner* factors weigh equally because the alternative to the restrictions (in Defendant's favor) would create a burden on guards and prison

20

resources (in the Government's favor). Upon weighing the other two factors, given the strong need to protect the public and the connection between the restrictions and that interest, the court finds that the restrictions on Defendant's speech are reasonable, and they do not violate the First Amendment. Accordingly, Defendant's motion to lift the restrictions listed in the IAR is denied.

**F. The protective order is amended.**

On May 17, 2019, the Government emailed Defendant's attorney regarding a protective order. [DE-139-1] at 1–2. The Government stated that it will soon produce thousands of pages of additional discovery that relate to ongoing criminal investigations, so it intended to file a motion for a protective order limiting dissemination of the new discovery. *Id.* In response, defense counsel wrote, "We would not object to your motion regarding discovery." *Id.* at 1. On May 21, 2019, the court entered a protective order limiting defense counsel's ability to copy or disclose material produced by the Government in discovery. [DE-132]. The order applies to Defendant and his co-defendants. *Id.*

The Government contends that the protective order is necessary because the second batch of discovery contains debriefs from co-defendants, and if Defendant had access to that material, he could send it to people like Ms. Lloyd, and co-defendants' girlfriends and families could be in danger. Hr'g Tr. [DE-146] at 54:24–55:15. At the second hearing, Special Agent Robertson testified that Defendant did, in fact, mail discovery to others. The Government also contends that the protective order is necessary because of ongoing criminal investigations. *Id.* at 55:17. The Government concedes that Defendant should be able to see the material and speak with his attorney about it; the Government argues only that he should not possess the material. *Id.* at 55:22–25.

Defendant contends that the protective order makes it impractical for his attorney to render effective assistance of counsel. *Id.* at 66:14. The second batch of discovery was fourteen thousand

21

pages. *Id.* at 65:19. In order to discuss the discovery with Defendant, defense counsel drove two hours to Raleigh and spent another two hours reading the discovery materials to Defendant. *Id.* at 66:6–8. They covered 2,500 pages, and there are 11,500 pages remaining. *Id.* at 66:11. Defense counsel stated that it is not practical for him to discuss the case with Defendant in that manner, and Defendant ought to be able to go through the discovery materials on his own to assist in his own defense. *Id.* at 64:18–20. Defendant also contends that 18 U.S.C. § 3500, the *Jencks* Act, allows the Government to withhold statements of Government witnesses until they testify, and the *Jencks* Act provides sufficient protection here.

Federal Rule of Criminal Procedure 16(d)(1) authorizes entry of protective orders and provides: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." When a party requests a modification or rescission of a protective order, courts consider whether good cause exists for the modification or rescission and whether the other party has relied upon the protective order. *See United States v. Morales*, 807 F.3d 717, 723 (5th Cir. 2015) (borrowing from the civil context and considering the nature of the protective order, the foreseeability of the modification, the parties' reliance on the order, and whether good cause exists for modification); *United States v. Calderon*, No. 3:15-CR-25-JCH, 2017 WL 6453344, at *5 (D. Conn. Dec. 1, 2017) (considering whether there was "a compelling reason to modify" a protective order when the Government relied upon it); *United States v. Swartz*, 945 F. Supp. 2d 216, 219–20 (D. Mass. 2013) (considering "any change in circumstances necessitating modification, a party's reliance upon the protective order when it produced discovery materials[,] and the privacy interests of third parties"); *United States v. Bulger*, 283 F.R.D. 46, 54 (D. Mass. 2012) (requiring the defendant seeking modification to show "a changed circumstance or a new situation warranting such relief.").

First, the protective ordered here was supported by good cause when it was entered. In *United States v. Navarro*, -- F. App'x --, 2019 WL 1958739, at \*1 (4th Cir. 2019), the district court entered a protective order similar to the one in this case. The order required certain discovery materials to remain with defense counsel because the Government was concerned that if Navarro had possession of the materials, he "could disseminate [them] and jeopardize the safety of confidential informants and other cooperating witnesses." *Id.* The Fourth Circuit held that "the protection of witnesses is a compelling basis for a protective order," and it upheld the protective order. *Id.* Likewise, here, the protection of witnesses is good cause for the protective order. *See United States v. Bulger*, 283 F.R.D. 46, 56 (D. Mass. 2012) ("The 1974 advisory committee notes likewise recognize the 'obvious' appropriateness of a protective order 'where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed.'" (quoting Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1974 Amendments)). Moreover, the Government's second rationale for the protective order—to prevent interference in ongoing criminal investigations—constitutes good cause. *See United States v. Smith*, 985 F. Supp. 2d 506, 535 (S.D.N.Y. 2013) (holding that an ongoing criminal investigation is good cause for a blanket protective order).

However, Defendant has shown good cause to modify the protective order. It is burdensome and time-consuming for defense counsel to review thousands of pages of discovery with Defendant. Defense counsel stated at the first hearing that he reviewed 2,500 pages with Defendant in two hours,[2] and 11,500 pages remain. Hr'g Tr. [DE-146] at 66:11. It would take Defense counsel just over nine hours to review the remaining discovery with Defendant at that rate, plus hours for travel and discussion. Defendant has shown that good cause exists for

---

[2] At that rate, defense counsel reviewed one page approximately every three seconds.

modifying the protective order. Accordingly, the protective order is amended to allow Defendant to have possession of his discovery material, but still prohibit Defendant from mailing the discovery material to others or communicating its contents to others outside the detention facility. That modification would resolve defense counsel's concerns that reviewing discovery page-by-page in person is too burdensome and time-consuming, and it would resolve the Government's concerns that Defendant could send his discovery to others.

## III. CONCLUSION

For the reasons stated herein, Defendant's motion to vacate the restrictions placed on his communications is denied and Defendant's motion to modify the protective order is allowed such that Defendant can possess his discovery material but not send it to others.

So ordered, the _13_ day of September 2019.

Robert B. Jones, Jr.
United States Magistrate Judge